***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before the Deputy Commissioner and the briefs and arguments of the parties. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence, or rehear the parties or their representatives. Accordingly, the Full Commission affirms with modifications, the Opinion and Award of Deputy Commissioner Homick.
 *********** EVIDENTIARY AND JURISDICTIONAL MATTERS *Page 2 
1. On December 20, 2010, Plaintiff filed a motion to amend the record to add additional records submitted by the parties with their contentions before the Deputy Commissioner. The admission of the additional evidence was agreed to by the parties. On January 7, 2011, Chair Pamela T. Young granted Plaintiff's motion to include the additional evidence.
2. Plaintiff filed a motion dated February 9, 2011, to strike Defendants' Form 44 and portions of Defendants' appellee brief to the Full Commission. Defendants filed an Industrial Commission Form 44 with their appellee brief alleging that the Deputy Commissioner erred by not allowing Defendants a credit for temporary total disability benefits paid at the incorrect rate. As Defendants did not timely appeal the Deputy Commissioner's Opinion and Award, the Full Commission does not have jurisdiction to review Defendants' assignments of error. Therefore, Plaintiff's motion to strike is granted.
 ***********
The Full Commission finds as fact and concludes as matters of law the following stipulations of the parties:
 STIPULATIONS
1. All parties are properly before the Industrial Commission, and the Industrial Commission has jurisdiction over the parties and the subject matter.
2. All parties are subject to and bound by the North Carolina Workers' Compensation Act.
3. All parties have been properly designated and there is no question as to misjoinder or nonjoinder of parties.
4. The carrier on the risk for Defendant-Employer is Old Republic, with Cannon *Page 3 
Cochran Management Service, Inc., as Third-Party Administrator.
5. Plaintiff sustained an admittedly compensable injury on July 13, 2006, arising out of and in the course and scope of his employment with Defendant-Employer, which was admitted on an Industrial Commission Form 60 Employer's Admission of Employee'sRight to Compensation.
6. An employment relationship existed between Plaintiff and Defendant-Employer on July 13, 2006.
7. Plaintiff's average weekly wage at the time of his compensable injury was $598.42, which yields a compensation rate of $398.45. However, Plaintiff was previously paid temporary total disability benefits based upon an average weekly wage of $880.37 and a compensation rate of $586.91, pursuant to an Industrial Commission Form 60 filed on September 25, 2006 and an Industrial Commission Form 62 Notice of Reinstatement of Modification ofCompensation filed on January 19, 2007.
8. Plaintiff filed an Expedited Form 33 Request for Hearing
on January 29, 2009, stating that "Defendants have refused to authorize medical treatment as recommended by the authorized treating physician." Prior to the hearing before the Deputy Commissioner, the parties resolved the issues as set forth in e-mail correspondence between the parties.
9. Plaintiff filed a Form 33 Request for Hearing
on June 12, 2009, stating that "There are issues pertaining to Plaintiff's entitlement to indemnity benefits and medical treatment."
10. Defendants filed a Form 33R Response to Request ForHearing on September 8, 2009, stating that "Defendants deny that plaintiff is entitled to ongoing temporary total disability benefits as he voluntarily resigned his employment with Defendant-Employer. In addition, Defendants have authorized all prescribed medical treatment necessary to effect a cure and/or provide relief to Plaintiff. Defendants reserve the right to assert additional defenses." *Page 4 
11. The parties certify that all pre-trial discovery has been completed and all relevant documents have been exchanged.
12. A mediation was held, and the parties reached an impasse on November 20, 2009.
13. The parties stipulated to the admissibility of the following documents, which were received into evidence:
 • Exhibit 1: Pre-Trial Agreement;
 • Exhibit 2: Compilation of documents including Industrial Commission Forms, Medical Records, Discovery Responses, Correspondence and Motions (consecutively paginated from 1-468);
 • Exhibit 3: January 29, 2008 Transaction Table;
 • Exhibit 4: February 18, 2009 Transaction Table; and
 • Exhibit 5: Agreement to Repay Insurance dated August 13, 2008.
14. The issues for determination by the North Carolina Industrial Commission are as follows:
 a. Whether Plaintiff is entitled to a resumption of indemnity benefits?
 b. Whether Plaintiff is entitled to ongoing medical treatment for his work-related injuries, including but not limited to depression and psychological treatment, and payment for the same?
 c. Whether Plaintiff and/or any third-party payers are entitled to reimbursement for accident-related medical treatment and prescriptions?
 d. Whether Defendants should be penalized under N.C. Gen. Stat. § 97-18 for their failure to timely pay Plaintiff's pain management bills?
 e. Whether Plaintiff is entitled to attorney's fees under N.C. Gen. Stat. § 97-88.1 *Page 5 
based on unfounded litigiousness?
 f. Whether Defendants should be ordered to pay for Plaintiff's past treatment with Carolina Behavioral?
 g. Whether Plaintiff's current job is suitable employment?
 h. Whether Defendants are entitled to a credit pursuant to N.C. Gen. Stat. § 97-42, or any other statute, for overpayment of temporary total disability benefits and, if so, the amount of such credit?
 ***********
Based upon all of the competent credible evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, Plaintiff was thirty years of age. Plaintiff completed the tenth grade of high school and later obtained a high school equivalency certificate by passing the General Educational Development Test (GED). Plaintiff has worked primarily performing manual labor.
2. Plaintiff began working for Defendant-Employer on April 3, 2003. Plaintiff worked as a packer, machine operator, quality technician, and in his last position as a machine operator. As a machine operator, Plaintiff operated and helped maintain a Borden press. Plaintiff's duties involved lifting parts for tooling that weighed between five and fifty pounds. Plaintiff's wife and father also worked for Defendant-Employer.
3. On July 13, 2006, Plaintiff sustained an admittedly compensable injury to his back while taking a part out of the Borden press.
4. On July 14, 2006, Plaintiff presented to Occupational Health Services at Scotland *Page 6 
Memorial Hospital for evaluation of back pain. Plaintiff reported that he had been experiencing back pain on and off for approximately two years, but that it had increased the day before while pulling out tools to work on a press. Plaintiff was diagnosed with a lumbar strain, referred to physical therapy, and released to return to work light duty.
5. On August 21, 2006, Plaintiff presented to Dr. Rakesh Chokshi, an orthopedic surgeon, for treatment. Dr. Chokshi diagnosed Plaintiff with a disc herniation at L4-5 and referred him for a series of epidural steroid injections. Dr. Chokshi then released Plaintiff to return to a light duty position as a crimp nut machine operator on October 3, 2006.
6. On October 18, 2006, Plaintiff presented to Dr. Chokshi and reported no lasting relief from the epidural injections. Dr. Chokshi authorized additional physical therapy and continued Plaintiff's light duty work restrictions. On November 29, 2006, as Plaintiff continued to report significant low back pain, Dr. Chokshi opined that Plaintiff was a candidate for either a microdiscectomy at L4-5 or a total disc replacement.
7. On February 12, 2007, Plaintiff presented to Dr. Alfred Rhyne, an orthopedic specialist, for an independent medical examination. If Plaintiff elected to proceed with surgery, Dr. Rhyne recommended a microdiscectomy instead of a total disc replacement. Dr. Rhyne referred Plaintiff for a functional capacity evaluation and for a work conditioning program. Plaintiff's functional capacity evaluation performed on April 24, 2007 revealed that he was able to perform light duty work.
8. Plaintiff elected to undergo the left L4-5 microdiscectomy, which Dr. Rhyne successfully performed on June 19, 2007. Dr. Rhyne opined, based upon the microdiscectomy, that Plaintiff's pain was being generated at the L4-5 disc level.
9. On September 12, 2007, Dr. Rhyne assigned work restrictions to Plaintiff of no *Page 7 
lifting over 25 pounds and no excessive bending, lifting, or twisting. Dr. Rhyne referred Plaintiff to physical therapy. For approximately the next five months, Dr. Rhyne continued to treat Plaintiff and made slight revisions to his work restrictions. On October 10, 2007, Dr. Rhyne continued Plaintiff's work restrictions, but pursuant to Plaintiff's request, added that Plaintiff needs to sit part of the time.
10. On October 17, 2007, Plaintiff's counsel wrote to Dr. Rhyne regarding Plaintiff's work restrictions. Dr. Rhyne responded that Plaintiff should return to work with a gradual increase in hours, beginning with four hours per day for two weeks, then progressing to six hours per day for two weeks, before returning to a full eight-hour shift.
11. On November 14, 2007, Dr. Rhyne wrote Plaintiff out of work and referred Plaintiff for a lumbar MRI. On December 17, 2007, Dr. Rhyne released Plaintiff to return to work for six hours per day as of January 25, 2008, with restrictions of no lifting greater than 20 pounds, and no prolonged bending, stooping, squatting, kneeling, or twisting. Dr. Ryhne recommended that Plaintiff be given the option to sit or stand. On January 18, 2008, Dr. Rhyne released Plaintiff to return to work with restrictions of no lifting greater than 20 pounds and no prolonged bending, stooping, squatting, kneeling, or twisting. Dr. Rhyne at this time did not restrict the number of hours Plaintiff could work and did not reference the option to stand or sit.
12. On February 21, 2008, Plaintiff completed a second functional capacity evaluation, which revealed self-limiting behavior. Although Plaintiff was objectively able to perform the tests, the evaluator noted that Plaintiff perceived himself as being crippled, with back pain impinging on all areas of his life. Plaintiff's self-limiting behavior resulted in an inability to identify Plaintiff's maximum work abilities that require frequent walking. Based on Plaintiff's performance, the functional capacity evaluation revealed that Plaintiff was able to *Page 8 
perform medium duty work with the ability to lift 20-50 pounds occasionally, 10-20 pounds frequently, and the ability to stand and walk frequently. These were based on working eight to ten hours a day, five days a week.
13. On February 25, 2008, Dr. Rhyne opined that Plaintiff was at maximum medical improvement and assigned a twelve percent (12%) permanent partial impairment rating to Plaintiff's back. Dr. Rhyne assigned permanent work restrictions of working no more than four hours a day for one week, no more than six hours a day for the second week, and no more than eight hours a day thereafter, with no lifting over 30 pounds. In addition, Plaintiff was instructed to avoid prolonged bending, stooping, squatting, kneeling, and twisting. Dr. Rhyne continued these work restrictions through February 27, 2009.
14. After Plaintiff had reached maximum medical improvement, he continued to work for Defendant-Employer. He alternated between a line checking position and the crimp nut assembly position. In the line checking position, Plaintiff was allowed to sit and was required to pull cans off the lines and check them for defects before replacing them on the conveyor belts. The crimp nut assembly position required Plaintiff to place a round crimp nut on top of one of the pedestals and push a button to apply a chemical to the outside of the nut. Plaintiff would then remove the crimp nut and place it on a tray. According to Plaintiff, the crimp nuts came in boxes weighing thirty pounds and the trays of crimp nuts weighed approximately ten pounds each. Plaintiff was able to either sit or stand while performing these duties. Neither of these positions required excessive lifting over 30 pounds or prolonged bending, stooping, squatting, kneeling, or twisting. Therefore these positions were within the permanent work restrictions assigned by Dr. Rhyne.
15. Dr. Rhyne opined that the line checking position and the crimp nut assembly *Page 9 
position complied with the work restrictions assigned as of September 12, 2007, and February 25, 2008.
16. Plaintiff testified that the vibrations within Defendant-Employer's facility caused his back to hurt. However, Defendant-Employer had not had any complaints about the vibrations. While Plaintiff requested a note from Dr. Rhyne to be able to sit while performing his job, Plaintiff did not inform or express concern to Dr. Rhyne about the vibrations.
17. On March 19, 2008, Defendants filed an Industrial Commission Form 28T, Notice of Termination of Compensation by Reason of TrialReturn to Work, indicating that Plaintiff's temporary total disability benefits were terminated on February 25, 2008, and that Plaintiff returned to work at the same or greater wages on February 26, 2008.
18. On May 15, 2008, Plaintiff presented to Jerri Patterson, a nurse practitioner in the area of pain management. Ms. Patterson is supervised by Dr. Francis Corrigan, an anesthesiologist and pain management specialist, who administered epidural steroid injections to Plaintiff as recommended by Ms. Patterson.
19. On July 29, 2008, Plaintiff presented to Dr. Donna Weiner, a clinical psychologist, upon referral of Ms. Jerri Patterson. Dr. Weiner diagnosed Plaintiff as having a general mood disorder and depressive symptoms secondary to chronic pain. Dr. Weiner was unable to opine whether Plaintiff required ongoing psychotherapy, a psychiatric evaluation, or whether pre-surgical or post-surgical counseling would be necessary for Plaintiff. Dr. Weiner deferred to the opinion of Dr. O'Malley, a clinical psychologist who subsequently evaluated Plaintiff, regarding his need for further psychological treatment.
20. On August 13, 2008, Plaintiff resigned from his position with Defendant-Employer in order to begin a new position as an insurance salesman, which Plaintiff felt would *Page 10 
be an easier and better suited job for him. Plaintiff, on his own, completed a course to become a licensed insurance salesman.
21. Harriet Johnson, a human resources officer with Defendant-Employer, assisted Plaintiff with the drafting of his resignation letter. Plaintiff reviewed the letter and signed it. Plaintiff also submitted a second hand-written resignation letter on the same day to his immediate supervisor, Jerry Chavis, in which Plaintiff indicated that he "can't afford to work for free" and that he "must leave." Plaintiff also wrote, "I am clocking out and not coming back, I quit." Neither resignation letter indicated that Plaintiff was resigning from his position due to back pain or any other issues associated with his work-related injury.
22. At the time of his resignation, Plaintiff had been working in either the line checking position or the crimp nut assembly position for five months and was in good standing with Defendant-Employer.
23. The line checking position and the crimp nut assembly position were available and continued to be available after Plaintiff's resignation.
24. At the time of Plaintiff's injury on July 13, 2006, Plaintiff earned $12.10 per hour. At the time of his resignation on August 13, 2008, Plaintiff was earning $13.02 per hour.
25. After working as an insurance salesman for two to three months, Plaintiff was terminated for lack of production. Plaintiff testified that during the course of his employment as an insurance salesman, he earned approximately $300.00 from one insurance sale. Plaintiff testified that he found the position by posting his job application on Monster.com and that he was not assisted or advised by Defendant-Employer to pursue other employment opportunities.
26. On March 24, 2009, seven months after Plaintiff resigned from his position with Defendant-Employer, Dr. Rhyne reduced Plaintiff's lifting restriction to 20 pounds. Dr. Rhyne *Page 11 
testified that with these restrictions, Plaintiff may experience some degree of pain, but that he will not hurt himself further. The 20-pound lifting restriction is not a permanent restriction. Dr. Rhyne opined that Plaintiff will be in the 20 to 50 pound lifting range for a long time. Dr. Rhyne indicated that the more pain Plaintiff is in, Plaintiff should gravitate to the 20-pound lifting restriction and as Plaintiff experiences less pain, he should be able to lift closer to the 50-pound range.
27. Plaintiff remained out of work until approximately September 2009, when he found employment at the Cyber Jolt Café in Fayetteville, North Carolina. In this position, Plaintiff is allowed sit down when he is not accepting money from patrons. Dr. Rhyne opined and the Full Commission finds that Plaintiff's position at Cyber Jolt Café is within Plaintiff's work restrictions. Plaintiff testified that in this job he earns $7.50 per hour and that his hours vary depending on the amount of business the café has.
28. Plaintiff testified that his medical condition has improved considerably since he began working at the Cyber Jolt Café. As a result, Plaintiff postponed the fusion surgery recommended by Dr. Rhyne. This was corroborated by the testimony of Ms. Patterson, the nurse practitioner in the field of pain management, who also testified that Plaintiff's mood was better and he was more goal-oriented.
29. Plaintiff testified that he quit smoking and became more active which contributed to his improvement in mood and outlook. Plaintiff testified that his depression had completely eradicated at the time of the hearing before the Deputy Commissioner and that he had told Dr. O'Malley that he was capable of eight to ten hours of productive activity per day.
30. On February 4, 2010, Plaintiff presented to Dr. Brian O'Malley, a clinical psychologist, for an independent evaluation. Dr. O'Malley opined that Plaintiff did not require *Page 12 
ongoing psychological counseling or psychiatric treatment. Dr. O'Malley did note that if Plaintiff decided to undergo the fusion surgery recommended by Dr. Rhyne, Plaintiff may need pre-surgical psychotherapy. Dr. O'Malley recommended two to three sessions of psychological counseling prior to any back surgery to make certain Plaintiff had appropriate expectations regarding surgical results.
31. Based on the greater weight of the medical evidence, the Full Commission finds that Plaintiff does not require ongoing psychological or psychiatric counseling but that two to three psychological sessions, as recommended by Dr. O'Malley, are reasonable and necessary in the event Plaintiff proceeds with the recommended back surgery.
32. Based on the greater weight of the evidence, the Full Commission finds that Plaintiff's positions in line checking and crimp nut assembly with Defendant-Employer were within the work restrictions assigned by Dr. Rhyne. The Full Commission further finds that in these positions Plaintiff was earning wages greater than his pre-injury wage. Therefore, the Full Commission finds that the line checking and crimp nut assembly positions constituted suitable employment. The Full Commission further finds that Plaintiff unjustifiably refused suitable employment when he voluntarily resigned on August 13, 2008.
33. At the time of and following his voluntary resignation, suitable employment was available to Plaintiff with Defendant-Employer.
34. For various periods between August 22, 2006 and February 25, 2008, Defendants paid to Plaintiff temporary total disability benefits at a rate of $586.91 per week based upon an average weekly wage of $880.32. It was later determined, and the parties have so stipulated, that Plaintiff's correct average weekly wage and compensation rate are $598.42 and $398.45, respectively. Accordingly, Defendants overpaid Plaintiff in the amount of $188.46 per week for *Page 13 
a total of $12,306.23. The Full Commission finds that Defendants' overpayment of temporary total disability compensation to Plaintiff was solely attributable to their error, over which Plaintiff had no control.
35. There is insufficient evidence of record to determine if Defendants failed to timely pay Plaintiff's pain management bills.
36. Based on the greater weight of the evidence, the Full Commission finds that Defendants' actions were not based upon stubborn, unfounded litigiousness.
 ***********
Based upon the foregoing Stipulations and Findings of Fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. On July 13, 2006, Plaintiff sustained an admittedly compensable injury by accident to his back, arising out of and in the course of his employment with Defendant-Employer. N.C. Gen. Stat. § 97-2(6).
2. Plaintiff has the burden of proving disability, defined as a loss of wage earning capacity. Russell v. LowesProd. Distrib., 108 N.C. App. 762, 425 S.E.2d 454 (1993). In order to meet the burden of proving disability, Plaintiff must prove that he was incapable of earning pre-injury wages in either the same or in any other employment and that the incapacity to earn pre-injury wages was caused by Plaintiff's injury. Hilliard v.Apex Cabinet Co., 305 N.C. 593, 290 S.E.2d 682 (1982). An employee may meet the initial burden of production by producing one of the following: (1) medical evidence that he is physically or mentally, as a result of the work-related injury, incapable of work in any employment; (2) evidence that he is capable of some work, but that he has, after a reasonable effort, been unsuccessful in his efforts to obtain *Page 14 
employment; (3) evidence that he is capable of some work, but that it would be futile because of preexisting conditions, such as age, inexperience, or lack of education, to seek employment; or (4) evidence that he has obtained other employment at wages less than his pre-injury wages. Demery v. Perdue Farms, Inc.,143 N.C. App. 259, 545 S.E.2d 485 (2001);Russell, 108 N.C. App. 762, 425 S.E.2d 454.
3. As a direct and proximate result of Plaintiff's admittedly compensable injury by accident on July 13, 2008, Plaintiff was unable to earn the same or greater wages for various periods between August 22, 2006 and February 25, 2008. Id. As Plaintiff earned wages greater than his pre-injury wages working for Defendant-Employer following his release at maximum medical improvement on February 25, 2008, Plaintiff failed to prove disability after February 25, 2008. Id.
4. If an injured employee refuses employment procured for him, which is suitable to his capacity, he shall not be entitled to any compensation at any time during the continuance of such refusal, unless in the opinion of the Commission such refusal was justified. N.C. Gen. Stat. § 97-32. Plaintiff's resignation on August 13, 2008, from his employment with Defendant-Employer, constitutes an unjustified refusal of suitable employment because the line checking and crimp nut assembly positions were available to Plaintiff and were within Plaintiff's restrictions. Id.
Therefore, Plaintiff is not entitled to disability benefits following his resignation on August 13, 2008, until such refusal of suitable employment ceases. Id.
5. Plaintiff is entitled to have Defendants pay all related medical expenses reasonably necessary to effect a cure, give relief, or lessen the period of disability for his compensable back condition. N.C. Gen. Stat. § 97-25. Plaintiff is not entitled to further psychological or psychiatric treatment, except in the event that Plaintiff elects to proceed with *Page 15 
the fusion surgery recommended by Dr. Rhyne, Plaintiff shall be entitled to two to three psychological counseling sessions, as recommended by Dr. O'Malley, to ensure his expectations of the surgical results are appropriate. Id.
6. Defendants paid Plaintiff temporary total disability benefits at a rate of $586.91 per week based upon an average weekly wage of $880.32. N.C. Gen. Stat. § 97-2(5). It was later determined, and the parties have so stipulated, that Plaintiff's correct average weekly wage and compensation rate are $598.42 and $398.45, respectively. Id. Accordingly, Defendants overpaid Plaintiff in the amount of $188.46 per week for a total of $12,306.23. As Defendants' overpayment of temporary total disability compensation to Plaintiff was solely attributable to their error, over which Plaintiff had no control, Defendants are not entitled to a credit for the overpayment due to miscalculation of Plaintiff's average weekly wage. N.C. Gen. Stat. § 97-42.
7. As Defendants' defense of this claim was not based upon stubborn, unfounded litigiousness, Plaintiff is not entitled to attorney's fees pursuant to N.C. Gen. Stat. § 97-88.1.
8. There is insufficient evidence that Defendants should be required to pay a late payment penalty pursuant to N.C. Gen. Stat. § 97-18(i).
 ***********
Based upon the foregoing Stipulations, Findings of Fact, and Conclusions of Law the Full Commission enters the following:
 AWARD
1. Plaintiff's claim for further indemnity benefits and for ongoing psychological or psychiatric counseling is hereby denied.
2. Defendants shall pay for all related medical expenses reasonably necessary to effect a cure, give relief, or lessen the period of disability for Plaintiff's compensable back *Page 16 
condition. In the event Plaintiff elects to proceed with the fusion surgery recommended by Dr. Rhyne, he shall be entitled to two to three psychological counseling sessions, as recommended by Dr. O'Malley, to ensure his expectations of the surgical results are appropriate.
3. Each side shall pay its own costs.
This the 14th day of April 2011.
 S/___________________ STACI T. MEYER, COMMISSIONER
CONCURRING:
 S/___________________ LINDA CHEATHAM COMMISSIONER
 S/___________________ CHRISTOPHER SCOTT COMMISSIONER *Page 1